Norman E. Clifton and Virgie Clifton v. Commissioner.
Clifton v. Commissioner
Docket No. 64659.
United States Tax Court
T.C. Memo 1958-65; 1958 Tax Ct. Memo LEXIS 165; 17 T.C.M. (CCH) 316; T.C.M. (RIA) 58065; April 21, 1958
*165 The Jewell Ridge Coal Corporation was the holder of a lease to mine coal in a certain area. Jewell Ridge Coal Corporation entered into contracts with petitioner, a truck mine operator, wherein the latter was given the right to mine a certain area to exhaustion, being paid a price per ton under the contracts based on the market price of the coal. Held, petitioner who mined coal under such contracts during the years 1953 and 1954, possessed an economic interest in the coal in place and was entitled to depletion thereon under the provisions of sections 23(m) and 114(b), I.R.C. of 1939, and sections 611 and 613, I.R.C. of 1954. John Y. Merrell, Esq., Shoreham Building, Washington, D.C., for the petitioners. Marion B. Morton, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in the income tax of the petitioners for the years 1953 and 1954 in the amounts of $6,262.26 and $783.90, respectively. The single question involved is whether petitioner Norman E. Clifton had an economic interest in the coal which he mined under contracts with Jewell Ridge Coal Corporation during the taxable years 1953 and 1954 so as to be entitled to deductions for depletion. Findings of Fact Some of the facts are stipulated and they are found accordingly. Petitioners are husband and wife and reside in Whitewood, Virginia. They filed their joint income tax returns for the taxable years 1953 and 1954 with the district director of internal revenue at Richmond, Virginia. Petitioner Virgie Clifton is a party only by virtue of said joint returns so hereinafter petitioner Norman E. Clifton will be referred to as "petitioner". Jewell Ridge Coal Corporation *167 (hereinafter referred to as Jewell Ridge) is a Virginia corporation which acquired by lease on November 1, 1941 from the Pocahontas Mining Corporation the exclusive right and privilege to mine and sell coal underlying a certain tract of land located in Virginia and West Virginia owned by the lessor. Under the lease Jewell Ridge was obligated to pay annual minimum royalties, tonnage royalty and land taxes. There was a provision in the lease that lessee would not sublet any part of the property without the written consent of the lessor. Jewell Ridge did not mine all of the coal within the boundaries of this lease, but entered into oral contracts with about 30 truck mine operators who mined the coal from within the designated areas covered by their agreements with Jewell Ridge. In 1948, one of these truck mine operators was John Keene, from whom petitioner purchased the right to mine under Keene's contract, in the latter part of 1948 at a cost of $1,000. Before purchasing this right, petitioner contacted the general superintendent of Jewell Ridge to ascertain the terms of the contract and obtained the approval of Jewell Ridge for his purchase of the rights under the contract. Petitioner *168 mined out the coal covered by the contract he acquired from Keene in approximately one year. Thereafter, he acquired other contracts from Jewell Ridge. From 1948 to the time of trial, petitioner has had approximately seven contracts with Jewell Ridge. During the years 1953 and 1954, petitioner mined coal under three contracts with Jewell Ridge. Two of these contracts provided for a deep mining operation and one provided for an auger mining operation. The terms and conditions of all the contracts petitioner had with Jewell Ridge were the same. These terms and conditions are as follows: 1. Each contract covered a specific, bounded, area of land and petitioner was given the exclusive right to mine all merchantable coal from within the designated area. 2. The mining operation was to be conducted in a safe manner and in accordance with the State and Federal laws and regulations applicable to coal mining. Petitioner was to be responsible to State and Federal mining authorities for the proper operation of his mines. 3. Jewell Ridge agreed to furnish the engineering services and petitioner agreed to mine in accordance with the maps and directions of the Jewell Ridge engineers. 4. *169 Petitioner was to conduct a union mining operation and was required to contract with the United Mine Workers of America for the labor needed in connection with the mining. 5. Petitioner was to be solely responsible for the mining operation, for the production of coal, and for the delivery of the coal, and Jewell Ridge had no part in the management of petitioner's mining operations. 6. Petitioner was to grade and maintain the roads necessary for the mining operation and to prepare the area for mining and open and operate the mine. Petitioner was to provide all of the equipment, labor, materials and supplies required in the mining operation. 7. Petitioner was required to deliver all coal produced to Jewell Ridge or by its direction, to the James A. Hagy Company. The James A. Hagy Company was a partnership composed of Jewell Ridge officials that discontinued operations in the early part of 1953. Petitioner could sell coal to his own employees for heir domestic use. 8. Jewell Ridge agreed to accept all coal produced by petitioner and there was no limitation on the amount of coal petitioner could produce. 9. Petitioner was to receive from Jewell Ridge a specified price per ton *170 for all coal delivered and nothing more. This price was to fluctuate in accordance with the market price of coal. If the general market price of coal increased, petitioner's price per ton would increase; also, if the general market price of coal decreased, petitioner's price per ton would decrease. Each time petitioner acquired a contract, he would first grade a road to the seam of coal in the designated area. This road was maintained by petitioner during the operation of the particular mine involved. Then, petitioner would face up the coal and provide power to operate the mine. In providing power, he would contract with the power company to install lines and transformers and would pay for the power used. All of this was at the expense of the petitioner. The equipment necessary to provide the power was owned by the power company. Petitioner also provided the equipment, buildings, and material necessary to mine and produce the coal. During the years 1953 and 1954, petitioner employed approximately 30 people in his operation. He paid Social Security, Workmen's Compensation and State Unemployment Compensation on his employees. He was also required to provide and pay for liability *171 insurance on his mining operation and to obtain the necessary State and Federal mining permits. He also entered into a contract as owner of the mine with the United Mine Workers. During the period petitioner has mined coal under contracts with Jewell Ridge, he has always mined all of the coal in the designated area; has never walked off a contract job, nor has Jewell Ridge ever threatened to cancel a contract. Except for a brief period of four or five days when petitioner was having labor difficulties, Jewell Ridge has never ordered petitioner to stop producing coal but has accepted all of the coal which petitioner has produced. As of December 31, 1953, and December 31, 1954, the cost of mining equipment used in petitioner's business was as follows: Year
Amount
Dec. 31, 1953
$51,420.77
Dec. 31, 1954
63,653.11
The expenses, including materials and supplies of petitioner's coal mining business for the years 1953 and 1954, were as follows: Year
Amount
1953
$104,002.62
1954
119,220.61
The following schedule shows by months for each of petitioner's taxable years 1953 and 1954 the amounts he was paid per ton for coal deep-mined and delivered *172 to Jewell Ridge and for coal mined by the auger method and delivered to Jewell Ridge. The schedule also shows the average monthly prices per ton received by Jewell Ridge for sales of its coal and the wholesale price indexes (1947-1949=100) for bituminous coal as prepared by the Bureau of Labor Statistics, United States Department of Labor. 1953
Amt.
Average
Paid for
Monthly
B.L.S.
Amt. Paid
Auger-
Sales Price
Wholesale
for Deep-
Mined
Obtained by
Price
Mined Coal
Coal
Jewell Ridge
Index
January
$4.50
$4.50
$6.52
112.0
February
4.50
4.00
6.21
111.6
March
4.50
4.00
5.83
109.8
April
4.25
4.00
5.65
107.5
May
4.25
4.00
5.59
107.0
June
4.25
4.00
5.82
107.1
July
4.00
4.00
5.50
107.4
August
4.00
4.00
5.25
106.9
September
4.00
4.00
5.52
107.3
October
4.00
4.00
5.39
107.9
November
4.00
4.00
5.63
107.9
December
4.00
4.00
5.39
107.9
1954
January
$4.00
$4.00
$5.60
107.1
February
4.00
4.00
5.40
106.0
March
3.60
3.60
4.92
102.5
April
3.60
3.60
4.71
101.4
May
3.60
2.75
4.82
101.2
June
3.60
2.75
4.92
101.1
July
3.60
2.75
4.70
101.2
August
3.60
2.75
5.00
101.5
September
3.60
2.75
5.25
101.8
October
3.60
2.75
5.29
101.9
November
3.60
2.75
5.26
101.8
December
3.60
2.75
5.33
101.7
*173 Opinion Petitioner argues that by virtue of the contract under which he mined coal for Jewell Ridge he possessed an economic interest therein and he is therefore entitled to a deduction for depletion under the provisions of sections 23(m) and 114(b) of the Internal Revenue Code of 1939, and sections 611 and 613 of the Internal Revenue Code of 1954. Respondent's contention is that petitioner was merely a contractor hired by Jewell Ridge to perform services and he enjoyed no more than an economic advantage derived from his production of coal. This issue has been before this and other courts so many times that no useful purpose will be served by an elaborate discussion of the basic concepts, so thoroughly gone into in prior cases. James Ruston, 19 T.C. 284; Virginia B. Coal Co., 25 T.C. 899; Walter Bernard McCall, 27 T.C. 133; Denise Coal Co., 29 T.C. - (Dec. 24, 1957); Parsons, et al. v. Smith, - Fed. (2d) - (C.A. 3, Mar. 27, 1958); Huss, et al. v. Smith, - Fed. (2d) - (C.A. 3, Mar. 27, 1958); Nathan Fink, et al., 29 T.C. - (Mar. 20, 1958). It is enough to say the decisions make it clear that whether or not the *174 taxpayer has an economic interest in the coal in place which will support a percentage depletion allowance for the contract miner, is dependent on the facts, and more particularly the terms of the contract. The decisions generally hold that the miner acquires an economic interest in the coal in place when he acquires the exclusive right to mine an area to exhaustion and the income he receives from his mining operation varies in accordance with the market price of the mineral. James Ruston, supra; Virginia B. Coal Co., supra; Walter Bernard McCall, supra., Denise Coal Co., supra. The common ground on which these opinions are based is that the miner, with the exclusive right to mine to exhaustion, and whose income is geared to the market price of the product mined, has acquired something more than the independent contractor who contracts for mining services at a set price per ton of the product mined. There are, as might be expected, many border-line cases, where the agreement as to the allowable extent of the mining operation is uncertain or the relationship of mining income to price of the mined mineral is somewhat vague. We need *175 not go into these cases for we feel this case falls within the generally accepted rule; that the indicia of economic interest is established by sufficient proof that the agreements of petitioner with Jewell Ridge were that he had the exclusive right to mine specific areas to exhaustion and the income from his mining operation varied in accordance with the market price of the coal he mined. Respondent argues that petitioner did not receive the exclusive right to mine to exhaustion; that Jewell Ridge had the unconditional right to terminate the contracts at any time. This contention is not supported by the record. Petitioner and the witness Hagy, who was the general superintendent of Jewell Ridge and the man who represented Jewell Ridge in negotiating all truck mine contracts, both testified it was their understanding of the contracts that petitioner was to have the exclusive right to mine all merchantable coal in the designated areas. Several other truck miners who operated under similar contracts testified that they understood the contracts gave them the right to mine all of the coal in the areas the company designated for them. Respondent points to one bit of testimony of Walker, *176 who was the executive vice president of Jewell Ridge. At one point in his direct examination he said Jewell Ridge could terminate any of the agreements with the truck miners "at the will and pleasure of the Jewell Ridge Coal Corporation * * * at any time that the Jewell Ridge Coal Corporation saw fit." But he also testified he had not had anything to do with negotiating the agreements with petitioner or in fact with any contract with the other 30 or 35 truck miners. When pressed on cross examination as to whether he understood "there [was] a definite understanding that you could kick him [petitioner] out at any time", he replied, "No, there was not." Respondent also points to the evidence of two incidents where petitioner's mining operations were stopped by Jewell Ridge. One was a temporary stoppage for a few days until petitioner could settle a union controversy that Jewell Ridge was fearful would spread, and the other was where petitioner's mining operation was interfering with a Jewell Ridge development mine operation. We deem these incidents insignificant and by no means indicative of a reservation of a right to terminate petitioner's contract at any time it saw fit. Respondent's *177 second contention is that the payments to petitioner for the coal delivered were not related to the market price of the coal. Again the record fails to support the contention. Hagy, who negotiated the contracts for Jewell Ridge, flatly said petitioner "was to receive a price for the coal to be determined by the market price. If the market price went up he would receive more. If it went down, he would receive less." Our findings of fact contain agreed figures showing the monthly price per ton received by petitioner and the average monthly prices received by Jewell Ridge from the sale of its coal and the Bureau of Labor Statistics of wholesale price indexes for bituminous coal for the years in question. We think the figures show some relationship between the amount petitioner was paid per ton and the price at which Jewell Ridge was selling its coal. It is true there were not day-to-day market price changes reflected in the amounts paid petitioner. Mr. Walker admitted the market price of the coal was a "factor" considered in fixing the amount paid petitioner but he said there were others such as the "economics in the coal industry generally" and "competition." While there were not many *178 changes in the amounts per ton paid to petitioner in the years in question, the changes were all downward, and the average monthly sales price of the coal by Jewell Ridge was generally downward. At any rate, it is clearly established petitioner was not to be paid a flat price per ton as was the case in Nathan Fink, et al., supra, and we think the price per ton he was to receive was subject to the variations of the market price of the coal he mined. Respondent makes some argument that Jewell Ridge could not make any sublease because in its own lease with Pocahontas Mining Corporation it covenanted not to lease or sublet any interest in the premises without lessor's consent. There is no merit in the argument. While Walker and others called the contracts with the truck miners "leases", it is unnecessary to so determine as the economic interest can be created by any form of legal relationship. Palmer v. Bender, 287 U.S. 551. Also, it would seem the Pocahontas Mining Corporation was well aware of the contracts with the truck miners as the lease was signed by Huston St. Clair as president of Jewell Ridge and Huston St. Clair as president of Pocahontas Mining Corporation. *179 Cf. James Ruston, supra. We conclude petitioner had an economic interest in the coal he mined in the taxable years involved so as to be entitled to deductions for depletion. Decision will be entered for the petitioners.